**Morton M. ROSE**
v.
**The UNITED STATES.**
**No. 48939.**

United States Court of Claims.
Oct. 5, 1954.

Corporation v. Circulators & Devices Mfg. Corp., D.C.N.Y., 1946, 67 F.Supp. 745, 746.

Edwin J. McDermott, Philadelphia, Pa., for plaintiff.

Frank J. Keating, Washington, D. C., with whom was Asst. Atty. Gen. Warren E. Burger, for defendant.

JONES, Chief Judge.

Plaintiff, on December 12, 1942, contracted with the defendant to manufacture and deliver 60,000 jackets and 100,-000 pairs of trousers. The jackets were to be delivered by April 26, 1943, and the trousers by May 21, 1943. The cloth was to be furnished by the Government. The stipulated price of the jackets was $0.-575 each.

At the time of the awarding of the contract plaintiff was engaged in the performance of several other contracts with the Government. It began its first cutting of material in connection with the instant contract on January 9, 1943.

Plaintiff experienced difficulty in training employees for certain operations and there was delay also in securing button-attaching machines and cartons for packing.

Finding that he would not be able to deliver the entire quantity of jackets within the time specified, the plaintiff requested defendant to terminate the contract as to 25,000 jackets. On March 17, 1943, the defendant complied with plaintiff's request and advised plaintiff that it would contract elsewhere for the terminated portion under Article 26 of the contract which provided for liquidated damages for delay in delivery, and for charging excess cost on relet portions of a terminated contract.

This provision and its substitute limiting liquidated damages are set out in finding 11.

On March 17, 1943, defendant contracted with the Puritan Knitting Mills Company of Altoona, Pennsylvania, for the 25,000 jackets at $0.649 each, for delivery by April 26, 1943.

The Bidder's Reference Book, incorporated in the contract, provided in part that contractor should carefully match the material so that the shading would be uniform. It also provided for 100 percent inspection of the first shipment, but if upon inspection of not less than 10 percent of any subsequent shipment, an unreasonable percentage of the supplies did not meet specifications the entire remaining part of the shipment might be rejected without further inspection.

Under this provision the defendant rejected a large number of packaged jackets. Plaintiff renumbered and reshipped many of the rejected packages, and they were again rejected by the defendant without further inspection. The extent of acceptance and rejection is set out in finding 13, showing that only about one-third of those that were shipped were accepted for delivery under the contract.

Plaintiff completed manufacturing operations under the contract June 12,

1943. Thereafter plaintiff's facilities were engaged in repairing jackets that had been rejected by defendant.

On October 22, 1943, defendant terminated plaintiff's right to deliver 7,210 jackets under Article 26 of the contract and on the same day contracted with Brill Uniforms, Inc., of Milwaukee, Wisconsin, to manufacture that number. The contract price was $0.825 each, which was unreasonably high. Although it was defendant's practice in reletting terminated portions of contracts to solicit bids from two or more contractors, the purchase order was placed with Brill without prior solicitation or inquiry among other manufacturers. The trial commissioner who heard the testimony found that a reasonable price would have been $0.745 per garment, and we adopt that finding.

After some correspondence the parties entered into a supplementary agreement called "Modification E," by the terms of which defendant agreed to accept, at a reduced price, the garments that did not meet specifications. Plaintiff was paid for those garments on the reduced basis stipulated in the agreement pertaining to the rejected garments.

As to the trousers, there was a separate contract. It also called for garments of a uniform shade. It further specified the sizes and the yardage of government material to be allowed per garment. The trousers were to be delivered according to a schedule which called for deliveries beginning January 21 and ending May 21, 1943.

The Bidder's Reference Book was also incorporated by reference into this contract and due to what was regarded as an unreasonably high percentage of defective trousers that had been found upon inspection after delivery, defendant rejected a large number of packaged trousers without inspection. These were renumbered, reshipped and again rejected, the numbers being set out in the table in finding 25. The table includes duplicated shipments.

Actually plaintiff manufactured 83,500 trousers, 18,374 of which were rejected as defective. These were retained by defendant and placed in the category of "irreparables."

The contract allowed 293,851.39 yards of material for the 100,000 trousers, but defendant stopped furnishing cloth after May 29, 1943. Up to that time it had furnished 257,897.75 yards of cloth. Plaintiff's manufacturing operations stopped for lack of cloth on June 26, 1943. Thereafter plaintiff's facilities were engaged in repairing trousers which had been previously rejected.

On October 23, 1943, defendant terminated plaintiff's right to deliver 35,468 pairs of trousers. On the same day it contracted by purchase order with the Blue Buckle Overall Company of Lynchburg, Virginia, for 25,000 pairs of trousers at $0.57 each, and with Brown Garment Manufacturing Company, Little Rock, Arkansas, for 10,468 trousers, at $0.61 each.

Defendant did not act with reasonable promptness. It could well have acted soon after May 29, 1943, when it stopped furnishing cloth to plaintiff, since it evidently had determined at that time to allow no more trousers to be manufactured by plaintiff under the contract.

Blue Buckle had offered and was able to make the entire number at $0.57. The record discloses no reason why the lower offer should not have been accepted, and plaintiff should not have charged the excess cost over the figure Blue Buckle offered.

Early in 1945 defendant and plaintiff entered into a supplemental agreement entitled "Modification F" by the terms of which defendant accepted the 18,374 pairs of trousers at a price below that which was provided in the original contract and plaintiff was paid on the reduced basis.

The cloth was spread from the bolt upon tables, doubled and redoubled until there were a number of plies and the pattern on a number of plies was thus

cut at one time. Component parts cut from each double layer of cloth were required to be marked with a distinctive number so that all the constituent parts of a garment could be identified with the same piece of material. This was called "shade-marking" and was required in order to secure as far as possible a uniform shade of cloth in the completed garment. In the beginning plaintiff used what is known as the Bates system which marked a number in indelible or black ink directly on the edge of the material but which, when the parts were sewn together, was not visible. Later plaintiff used what is known as a Soabar machine which automatically prints the ply number, cut number, size and bundle number on a roll of tickets and fastens an appropriate ticket to each part. Plaintiff had no Soabar machine at the commencement of the contract. He applied to purchase one, but was not given a preference rating. He later rented such a machine, but the record does not show just when the different methods of marking were used.

In its inspection defendant found that many garments were imperfect because of missing bartacks, open seams, drill holes, skipped stitches, raw edges, missing and misplaced buttons, defective pockets, dissimilar pockets and missing labels. In addition a number of garments were found upon inspection to be shaded and were rejected for that reason. Defendant, however, accepted shaded garments if shade-markings on component parts indicated that they had been cut from the same piece of material.

As of April 20, 1943, more of plaintiff's shipments had been rejected than had been accepted. The details are set out in finding 35. In May 1943 plaintiff discovered that a quantity of cloth which at that time was on the table ready for cutting was not of uniform shade. He brought the matter to the attention of the contracting officer, who was furnished with samples of the cloth.

There was considerable controversy over how much the difference in shade in some of the garments was due to the difference in the shade of the particular bolt of cloth, but the evidence does not disclose just what portion of the mismatched shading was due to the variation in the bolt. The evidence shows that there was some splicing of cloth, some carelessness in shade-marking, and mishandling of shade-marked cut component parts and also inadequate supervisory inspection.

■ In procuring jackets from Puritan and Brill by relet purchase order $576.80 paid to Brill was in excess of the reasonable market price and should not have been charged to plaintiff.

If, in reletting the terminated portion of the trousers contract, the entire contract had been let to Blue Buckle, which was ready, willing and able to produce the entire quantity, the extra cost chargeable to plaintiff would have been reduced by $444.34.

■ Plaintiff earnestly claims that it is entitled to receive a remission of liquidated damages on account of the delivery and acceptance of the "irreparables" and that because of the ultimate acceptance of the "irreparables" the delivery should be dated back to the dates when they were reshipped as "irreparables," and claims that he should recover the sum of $1,892.26. This refund cannot be allowed. We think that the acceptance of the so-called "irreparables" was in the nature of a compromise settlement as entered into by supplemental agreement and did not relieve plaintiff of his obligation to deliver acceptable garments within the time specified in the contract. The defendant assessed no liquidated damages for any period after August 21, 1943. The cancelling of and reletting of portions of the contract probably made the liquidated damages less than would have obtained had there been no cancellation of the original obligation. MacLaren Sportswear Co. v. United States, 101 F.Supp. 885, 121 Ct.Cl. 396. However, if defendant had relet the terminated portion of the contract as of June 5, 1943, we find that 23,976 completed trousers under the relet contract would

have been made sufficiently prior to August 19, 1943, as would have resulted in liquidated damages of $601.40 less than the amount that was actually withheld from plaintiff under the terminated portion of the contract.

Plaintiff is entitled to recover the sum of $1,622.54.

It is so ordered.

LARAMORE, MADDEN, WHITAKER and LITTLETON, Judges, concur.